IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | |
|---|---|
| CEDRIC R. WILLIAMS, )<br> )<br>    Plaintiff, )<br> )<br>    v. )<br> )<br>TOWN OF WHITE HALL, )<br>ALABAMA, etc., et al., )<br> )<br>    Defendants. ) | CIVIL ACTION NO.<br>2:05cv700-MHT<br>(WO) |


OPINION

Plaintiff Cedric R. Williams, who claims he was
unlawfully detained during two incidents in October 2004,
filed this lawsuit alleging a violation of his Fourth
Amendment rights, as enforced through the Fourteenth
Amendment and 42 U.S.C. § 1983, as well as asserting
state-law claims for negligent supervision, false arrest
and false imprisonment, outrage, and conspiracy.
Williams names the following defendants: the Town of
White Hall, Alabama; the White Hall Bingo Commission;
Sellers Day Care, Inc.; Fair Trade Ventures, Ltd.; and

Chad Dickie.  This court has original jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as well as supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

This case is before the court on the defendants' motions for summary judgment.  For the reasons that follow, summary judgment will be granted.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, at which point the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  <u>Celotex Corp.</u>

v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3

## II. FACTUAL BACKGROUND

This case arises out of two incidents that occurred in White Hall, Alabama, on the premises of the White Hall Gaming Center.  The Gaming Center is an establishment operated by Freedom Trail pursuant to an agreement with Sellers Day Care under a license issued by the Town of White Hall and the White Hall Bingo Commission.

On October 21, 2004, Williams was a patron at the Gaming Center when he was suspected of using a counterfeit $ 50 bill.  The Gaming Center's security staff notified White Hall police and ejected Williams from the building.  Outside the building, the police officers had Williams empty his pockets, questioned him for ten to 15 minutes, and then released him.

The next day, Williams returned to the Gaming Center, and he was again ejected from the building.  This time, White Hall police officers handcuffed him and placed him in a police vehicle.  Rather than formally book him at the police station, the officers called the mayor of

4

White Hall, John Jackson, who directed them to bring
Williams to his office at town hall.  The police took
Williams to Mayor Jackson's office, Williams was again
required to empty his pockets, and Jackson questioned
Williams for approximately 30 to 40 minutes before he was
released.

Somewhat complicating matters is the fact that
several individuals involved in the incidents just
described play more than one role in the life of this
small town.  Jackson is both the mayor of White Hall and
executive director of Sellers Day Care, and a number of
White Hall police officers are also employed as private
security officers at the Gaming Center.

### III. DISCUSSION

### A. Federal Claim

Williams claims that the October 21 and 22 incidents
violated his search-and-seizure rights under the Fourth
Amendment, as enforceable in a civil action through 42

5

U.S.C. § 1983.   The court will begin with the § 1983 claim against the town and the commission, and subsequently discuss the § 1983 claim against the private parties.   The supplemental state-law claims will be addressed last.   Because Williams does not say why the liability of the town and the commission should be considered separately, the court will refer to both entities as simply the Town of White Hall or the town.

### 1.  Town of White Hall

#### a.

At the outset, the court must reject the Town of White Hall's argument that the court lacks subject-matter jurisdiction on account of Williams's failure to file a notice of claim within six months as required under Alabama law.   1975 Ala. Code § 11-47-23.   The six-month notice statute does not apply to federal § 1983 actions. Acoff v. Abston, 762 F.2d 1543, 1546 (11th Cir. 1985).

6

Accordingly, the court proceeds to the merits of the § 1983 claim.

### b.

It is well established that there can be no respondeat superior liability for § 1983 claims. <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 691 (1978); <u>Holloman v. Harland</u>, 370 F.3d 1252, 1290 (11th Cir. 2004). In other words, the named defendant in a § 1983 suit may be held liable only for that defendant's own unconstitutional conduct, not that of subordinates or employees. <u>Monell</u>, 436 U.S. at 694. Therefore, the question is whether the Town of White Hall itself violated Williams's constitutional rights.

A municipality may be found liable under § 1983 only if the violation of the plaintiff's rights is attributable to a municipal policy or custom. <u>Id</u>. Thus, Williams is entitled to relief only if (1) his Fourth Amendment rights were violated, <u>and</u> (2) the violation was

attributable to a policy or custom of the town.  <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120 (1992); <u>Wyke v. Polk County Sch. Bd.</u>, 129 F.3d 560, 568 (11th Cir. 1997).  If either one of these conditions is not satisfied, then the town escapes liability under § 1983.[1]

### c.

The Supreme Court has held that a single decision by a policymaking official can subject the municipality to liability if the official has final policymaking authority in the area of the act or decision.  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480-83 (1986); <u>see</u> <u>Holloman</u>, 370 F.3d at 1291.  For instance, a city manager could subject the city to § 1983 liability for a single

---

1. In his opposition to summary judgment, Williams mistakenly addresses the issue of qualified immunity rather than municipal policy or custom.  Qualified immunity is relevant to § 1983 suits only when named officials are sued in their individual capacity for money damages; there is no qualified immunity for municipalities.  <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 166-67 (1993).

8

act of unlawfully terminating a city employee if the city manager has final policymaking authority in the area of hiring and firing.  See Martinez v. City of Opa-Locka, 971 F.2d 708 (1992).   To determine whether the decisionmaker in a particular case had final policymaking authority in that area, the court is directed to turn to state law and municipal ordinance.  Pembaur, 475 U.S. at 483; Martinez, 971 F.2d at 713.

While Mayor Jackson was a policymaking official for the Town of White Hall, the town cannot be held liable, for Jackson did not violate Williams's Fourth Amendment rights.  The evidence reflects that, on October 21, White Hall police were notified by security officers at the Gaming Center that Williams was suspected of using counterfeit money, in that he was trying to change a $ 50 bill on the floor of the center but refused to allow the center teller to change the bill.  Outside the Gaming Center, White Hall police questioned Williams for a short

period of time, and required him to empty his pockets, before they let him go.

Since the police required Williams to empty his pockets, they engaged in the type of search that must be supported by probable cause.  <u>United States v. Willis</u>, 759 F.2d 1486, 1497 (11th Cir. 1985).  "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  <u>Lee v. Ferraro</u>, 264 F.3d 1188, 1195 (11th Cir. 2002).

The court doubts that the White Hall police had probable cause that Williams had committed, or was committing, a crime.  However, critical here is that there is no evidence whatsoever that Mayor Jackson was even involved in the October 21 incident.  Therefore,

10

Williams cannot hold the town liable by way of Mayor Jackson.

The October 22 incident can be disposed of similarly. The undisputed evidence reflects that the White Hall police were once again called to the Gaming Center because Williams was being ejected.  This time, the police officers who responded called Mayor Jackson, reported that Williams was creating a disturbance, and asked for guidance.  Jackson responded by directing the officers to bring Williams to his office for questioning. The police handcuffed Williams, placed him in a police car, and brought him to the mayor's office for interrogation.  Williams seeks to hold the town liable based on Jackson's action.

There is no question that probable cause was required to detain Williams in this manner.  As a Fourth Amendment matter, placing a suspect in handcuffs and transporting him to a government office for interrogation must be supported by probable cause.  Kaupp v. Texas, 538 U.S.

11

626, 630 (2003) (holding that "involuntary transport to a police station for questioning is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause" (internal quotation marks and brackets omitted)); <u>United States v. Dunn</u>, 345 F.3d 1285, 1288 (11th Cir. 2003). The defendants' argument that Williams was never formally booked and fingerprinted is unavailing, as the facts demonstrate that Williams's detention was "sufficiently like arrest" to require probable cause.

Admittedly, there are disputed facts as to whether Williams was being disorderly.  The evidence reflects that the officers told Mayor Jackson that Williams was being disorderly, whereas Williams as well as a former security officer at the Gaming Center say that Williams was not disturbing the peace in any way.  But even if Williams was not actually engaged in any misconduct on October 22, Mayor Jackson's decision to have him arrested

was reasonable based on his officers' reports from the scene.

When a law enforcement official reasonably relies on information received from fellow officers in deciding to arrest a suspect, the relying officer is not subject to civil liability if it later turns out that the information was wrong and the arrest not supported by probable cause. <u>United States v. Hensley</u>, 469 U.S. 221, 230 (1985); <u>Whiteley v. Warden</u>, 401 U.S. 560, 568 (1971); <u>Hardesty v. Hamburg Township</u>, ___ F.3d ____, 2006 WL 2519924, at *8 (6th Cir. 2006); <u>Panetta v. Crowley</u>, ___ F.3d ____, 2006 WL 2383223, at *5 (2d Cir. 2006).

Here, even though the court credits Williams's testimony that he was not engaged in disorderly conduct, the defendants have submitted unopposed testimony by Mayor Jackson that the officers <u>told</u> him Williams was creating a disturbance. Armed with that information, Jackson behaved reasonably, that is, with probable cause, in directing the officers to detain Williams.

13

Any other result would be untenable as a policy matter.   It is perfectly self-evident that law enforcement officials must be able to rely, within reason, on information they receive from fellow law enforcement officials without fearing for personal liability if that information later turns out to be incorrect.  See Gordon v. Degelmann, 29 F.3d 295, 300 (7th Cir. 1994) ("Fear of personal liability if the [information] turns out to be erroneous would interfere with valuable institutions of law enforcement."). Likewise, policymakers with final authority must also be able to rely, within reason, on information they receive from subordinates without fearing for municipal liability if that information, too, turns out to be incorrect.  If this were not so, then one of two consequences would follow:  either the municipality would be liable for policymakers' acts made in reasonable reliance on information from subordinates, and the rule against respondeat superior would effectively collapse;  or

14

policymakers protective of the municipal fisc would refuse to rely on information from subordinates, and the day-to-day workings of our local governments would grind to a halt.

Therefore, to the extent Williams relies on the actions of Mayor Jackson to hold the Town of White Hall liable for the October 22 detention, he cannot prevail because Jackson did not violate Williams's Fourth Amendment rights.

### d.

Even if the White Hall police officers violated Williams's Fourth Amendment rights on October 21 and 22, Williams still cannot prevail against the town.  Under the Monell rule, the town cannot be held vicariously liable for the constitutional torts of its employees; nor is there any evidence in the record that White Hall police officers had the authority to set town policy.

Thus, the only remaining question is whether White Hall had a policy or custom of conducting searches and seizures without probable cause. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.... A custom is a practice that is so settled and permanent that it takes on the force of law." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997); <u>see also</u> <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 403-04 (1997). "The 'official policy' requirement [is] intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Pembaur</u>, 475 U.S. at 479.

Formal policies that violate the Constitution are rare, which means that most plaintiffs must allege an informal custom that takes on the force of law. <u>Grech v.</u>

16

Clayton County, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc).  It must be shown not only that such a custom exists, but that the custom is the "moving force" behind the constitutional violation.  Monell, 436 U.S. at 694.

There is a complete lack of evidence of a White Hall policy or custom of conducting searches and seizures without probable cause.  Although Williams argues that Mayor Jackson, by virtue of his position at Sellers Day Care, has an interest in ejecting patrons from the Gaming Center when they win money there, the undisputed evidence is that neither Jackson nor the town assert any control over the operations of the Gaming Center.  Indeed, a search of the record reveals no minimally reliable evidence that the ejection of jackpot winners routinely takes place, that Jackson actually directs such conduct, or that it is the policy or custom of the Town of White Hall to search and seize such patrons without probable cause as required by the Fourth Amendment.[2]  Furthermore,

---

2.  Williams offers an affidavit from a former
(continued...)

17

the evidence reflects that there is simply nothing to support any claim that Williams's searches and detentions were part of, or attributable to, such a custom or policy of the town even if one were to exist.

e.

Accordingly, there can be no municipal liability for the October 21 and 22 incidents involving Williams. There is no evidence of a formal policy or informal custom that deprived Williams of his Fourth Amendment rights; the police officers who stopped and searched Williams on October 21 were not 'policymakers' whose acts could subject the town to liability under § 1983; and

---

(...continued)

receptionist and security guard at the Gaming Center who states that Mayor Jackson frequently called the Gaming Center to speak with its manager and that once during her employment the other security officers ejected a patron who had won three jackpots. This statement is not enough for a reasonable jury to conclude that patrons are detained and searched because they win money, let alone that the town has a custom of detaining and searching such persons.  See Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004).

Mayor Jackson's October 22 decision to have Williams
arrested was made in reasonable reliance on information
he received from police officers whose constitutional
errors are not those of the municipality.[3]


## 2. Private Defendants

The court now turns to Williams's § 1983 claim
against the private defendants alleged to have acted
under color of state law.  Sellers Day Care is a
nonprofit corporation that purchased a bingo license from
the Town of White Hall, and Fair Trade contracted with
Sellers Day Care to operate bingo at the Gaming Center.
Dickie, a Fair Trade employee, was the general manager of

---

3.  Whether the mayor of White Hall has final
policymaking authority over police matters is, as stated,
a question of municipal policy.  Pembaur, 475 U.S. at
483; Martinez, 971 F.2d at 713.  Unfortunately, the
ordinances of White Hall are not known to this court, and
none of the parties to this proceeding has submitted
evidence as to what its policy in this area happens to
be.  Because Williams bears the burden, in the face of
defendants' summary-judgment motion, of showing that
Mayor Jackson had policymaking authority over police
matters, this absence of evidence is another reason why
summary judgment should be entered against Williams.

the Gaming Center at the time of the October 21 and 22 incidents.

Even though these defendants are private parties, Williams argues that their connections with the Town of White Hall subject them to § 1983 liability under color of state law.  As previously mentioned, Mayor Jackson is executive director of Sellers Day Care in addition to mayor of White Hall, and Fair Trade employed several White Hall police officers as private security guards. Williams contends that Fair Trade and Dickie are liable under § 1983 because they employed White Hall police officers as private security guards; because the security guards' uniforms were virtually identical to police uniforms; and because the police officers participated in Fair Trade's removal of patrons from the Gaming Center. Williams further contends that Fair Trade and Sellers Day Care are liable because they were engaged in a joint venture with the town and public officials.

20

In order for a private party to be subject to liability under § 1983, that party must have acted under color of state law. In the context of the Fourteenth Amendment, this requires that the party's alleged actions are "fairly attributable to the State," <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982), and that the party "be a person who may fairly be said to be a state actor," <u>id</u>.; <u>see also</u> <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1130 (11th Cir. 1992). "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." <u>Id</u>.

There are three tests for state action by a private party: the public function test, the state compulsion test, and the nexus, or joint-action, test. <u>Id</u>.; <u>NBC v. Communication Workers of Am.</u>, 860 F.2d 1022, 1026 (11th Cir. 1988). Under the public function test, private actors are state actors when they perform functions "traditionally the exclusive prerogative of the state." <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 353 (1974).

Under the state compulsion test, state action occurs when "the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." NBC, 860 F.2d at 1026; see Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). Under the joint-action test, the government must have "so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise." NBC, 860 F.2d at 1026-27 (quoting Jackson, 419 U.S. at 357-58) (internal brackets and quotation marks omitted).

### a.

Williams contends that Fair Trade and Dickie are liable under § 1983 because they employed White Hall police officers as private security guards; because the security guards' uniforms were virtually identical to police uniforms; and because the police officers

participated in Fair Trade's removal of patrons from the Gaming Center.

Fair Trade's employment of police officers as private security guards does not itself transform the guards' activities into state action.  "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." <u>Edwards v. Wallace Cmty. Coll.</u>, 49 F.3d 1517, 1523 (11th Cir. 1995).  Courts that have previously considered whether off-duty police officers 'moonlighting' as private security guards acted under color of state law have determined that state action occurs when the guards represented themselves as police officers in some way--usually by wearing their police uniforms and badges, <u>Chapman v. Higbee Co.</u>, 319 F.3d 825, 834 (6th Cir. 2003), operating pursuant to police procedures rather than company policy, <u>Owens v. City of Ft. Lauderdale</u>, 174 F.Supp.2d 1282, 1290 (S.D. Fla. 2001) (Jordan, J.), or acquiring private employment through

23

official police channels, <u>Traver v. Meshriy</u>, 627 F.2d 934, 938 (9th Cir. 1980).  Here, in contrast, the evidence reflects that Fair Trade employed police officers solely in their private capacities.  "Not all actions by state employees are acts under color of law." <u>Edwards</u>, 49 F.3d at 1523.

Nor do private security guards transform into state actors merely because their uniforms closely resemble police uniforms. Here, Williams contends that the Gaming Center's security guard uniforms were virtually identical to the White Hall police officers' uniforms.  But Williams's own affiant states that the security uniforms have the word 'security' imprinted on them, whereas the police uniforms bear a 'police' label. Private security guards frequently wear uniforms that closely resemble police uniforms but can be distinguished by their label. Such attire does not, in and of itself, subject private entities to liability under § 1983.  See <u>Smith v. Detroit</u>

Entm't LLC, 338 F.Supp.2d 775, 783 (E.D. Mich. 2004)
(Rosen, J.).

Fair Trade and Dickie also did not become state
actors whenever on-duty police officers aided security
officers in removing people from the Gaming Center.  When
a security situation arises, private businesses that call
the police do not transform themselves into state actors.
"The mere presence of police officers does not transform
the conduct of private parties into state action."
Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442,
1450 (10th Cir. 1995).  It is undeniable that if a
private business wishes to eject a rowdy customer and the
customer refuses to leave, the police may be called to
remove that person by force.

Under the Eleventh Circuit's three state-action
tests, Williams's contentions regarding the police and
security services lack merit.  First, Fair Trade's
private security did not perform an exclusive public
function, even though Fair Trade's security guards wore

25

uniforms that resembled--but were distinguishable from--police uniforms.  Williams offers one affiant who claims that on June 7, 2006 (nearly two years after the incidents at issue in this case occurred), a White Hall police officer was in the Gaming Center with his police uniform on, but the affiant also represents that the officer stated he was on duty as a police officer at the time.  There is no evidence that, at the time Williams was ejected from the Gaming Center, private security guards working for Fair Trade held themselves out as having the authority of a police officer.

Second, the government did not compel, control, or encourage the conduct of Fair Trade's security officers. The town's policy was that police officers may moonlight as private security but are not acting as police officers on such occasions, and Fair Trade's policy was that police officers working security for Fair Trade are required to follow Fair Trade's procedures and are not considered police officers by Fair Trade.  Neither Mayor

Jackson nor the White Hall police exercised any compulsion or encouragement over the conduct of Fair Trade or its employees.

Third, neither Fair Trade nor Dickie acted as "joint participants" with White Hall police officers. When Fair Trade required police assistance at the Gaming Center, the company's policy was to call for on-duty police officers even when off-duty police officers happened to be present as security guards. Fair Trade's incident reports from the October 21 and 22 incidents both reflect that the Fair Trade guards' involvement was prior to and separate from the involvement of White Hall police officers. Although Williams alleges that the White Hall police officers' and Fair Trade security guards' uniforms are difficult to distinguish, his own affiant states that it was private security, not police, who escorted him out of the building. There is simply no reliable evidence that Fair Trade and Dickie acted jointly with the town in

a way that could possibly implicate the state action requirement of § 1983.

Furthermore, the bar on respondeat superior liability for § 1983 actions applies to private defendants just as it does to municipal defendants.  <u>Harvey</u>, 949 F.2d at 1130.  Therefore, even if an individual Fair Trade employee represented herself as a police officer, neither Fair Trade nor Dickie would be liable unless it was pursuant to a custom or policy of Fair Trade.  Again, the evidence reflects that Fair Trade's policy and custom is to keep private security functions as separate from police functions as possible, considering the nature of the work and the size of the town.

### b.

Williams also asserts that Sellers Day Care, Fair Trade, and Dickie deprived him of his constitutional rights under color of law because these private defendants are joint participants with the town in

28

running the Gaming Center. According to Williams, Mayor Jackson--who interrogated him on October 22--is at the center of the entire joint enterprise.[4] As mayor of the Town of White Hall, Jackson has an interest in seeing the Gaming Center succeed so that the town will reap the economic benefits of a thriving local economy; and, as a paid director of Sellers Day Care, Jackson has an interest in maximizing profits at the Gaming Center to increase Sellers Day Care's wealth. To that end, Jackson uses his public office, as well as his position at Sellers Day Care, to control the Gaming Center, including its security operations. Specifically, Williams believes that Jackson, Sellers Day Care, and the town have conspired with Fair Trade and Dickie to remove patrons of the Gaming Center who win too much money. Williams maintains that his ejection on October 21 and 22 was effectively part of a town policy to rid the Gaming Center of customers who are successful at bingo.

---

4.   As mentioned previously, Jackson is not being sued here.

29

Unfortunately for Williams, there is a complete lack of evidence supporting his theory.  To begin with, the evidence reflects that neither the town nor Sellers Day Care has a direct financial interest in Fair Trade, since Sellers Day Care paid the town a flat licensing fee and Sellers Day Care assigned the license pursuant to an agreement that does not involve profit-sharing.  To the extent Sellers Day Care and the town do have an interest in the economic wellbeing of the Gaming Center, there is no evidence that Jackson, Sellers Day Care, or the town actually exerted any improper influence over the operation of the Gaming Center, let alone that such a relationship was causally related to Williams's removal from the Gaming Center on October 21 and 22.

Without evidence that state actors improperly influenced or were inseparable from the Town of White Hall, the legal relationships between and among the defendants is not enough, standing alone, to impute state action to the private entities in this case.  Admittedly,

30

bingo is a regulated industry in Alabama.  Ala. Const. amend. 732 (providing for regulation of bingo games in White Hall).  "However, extensive regulation by the state is not enough to establish state action."  Nail v. Cmty. Action Agency of Calhoun County, 805 F.2d 1500, 1501 (11th Cir. 1986); see Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999).  The fact that the town has issued Sellers Day Care a license to operate the Gaming Center does not make Sellers Day Care, or its assignees or employees, state actors for § 1983 purposes.

Similarly, Sellers Day Care is not a state actor merely because Mayor Jackson is its executive director. Public officials routinely sit on the boards of directors of charities, businesses, and other corporations, and this is undoubtedly quite common in small towns such as White Hall.  Jackson's position with Sellers Day Care does not, by itself, turn Sellers Day Care into a state actor under § 1983.  Instead, the question is whether Jackson actually used the power or prestige of his office

to influence or control decisionmaking at Sellers Day
Care or, for that matter, at Fair Trade.  See Crowder v.
Conlan, 740 F.2d 447, 451-53 (6th Cir. 1984); see also
Willis v. Univ. Health Servs., Inc., 993 F.2d 837, 841
(11th Cir. 1993).  As previously discussed, the evidence
reflects that he did not.

Because none of the private defendants can be
considered state actors within the meaning of § 1983, it
is unnecessary to consider whether they would be liable
for violating Williams's constitutional rights if they
were acting under color of state law.  NBC, 860 F.2d at
1028.  Accordingly, summary judgment on Williams's § 1983
claims will be granted for the private defendants.


                    B. Supplemental State-Law Claims

This court "may decline to exercise supplemental
jurisdiction over a claim if ... [it] has dismissed all
claims over which it has original jurisdiction."   28
U.S.C. § 1367(c)(3).  Because summary judgment is due to

be granted on Williams's federal claims, the court declines to exercise supplemental jurisdiction over his state-law claims. Accordingly, these claims will be dismissed, albeit without prejudice. See <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726-27 (1966); <u>L.S.T., Inc. v. Crow</u>, 49 F.3d 679, 685 (11th Cir. 1995). Pursuant to 28 U.S.C. § 1367(d), the applicable statute of limitations under state law will be tolled 30 days so as to allow Williams time to refile his state-law claims in state court.

. . .

For the foregoing reasons, the court concludes that summary judgment should be granted on Williams's federal claims and that his state-law claims should be dismissed without prejudice.

An appropriate judgment will be entered.

DONE, this the 29th day of September, 2006.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE